UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CHERI A. BRUDEVOLD,

               Plaintiff,

     v.

JO ANNE B. BARNHART, Commissioner of
Social Security,

               Defendant.

CASE NO.    C06-5205KLS

ORDER AFFIRMING THE
COMMISSIONER'S DECISION
TO DENY BENEFITS

Plaintiff, Cheri A. Brudevold, has brought this matter for judicial review of the denial of her applications for disability insurance and supplemental security income ("SSI") benefits. The parties have consented to have this matter be heard by the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and Local Magistrates Rule 13. After reviewing the parties' briefs[1] and the remaining record, the undersigned hereby finds and ORDERS as follows:

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is forty-eight years old.[2] Tr. 25. She has a tenth grade education and past work

---

[1] Rather than file an opening brief in this matter, plaintiff has filed a motion for summary judgment. See (Dkt. #13). While filing her brief in the form of such a motion has no substantive impact on either the merits of the issues she raises therein or on the procedural aspects of this case in general, the Court does note that the rules governing motions for summary judgment do not apply to these type of matters in this district.

[2] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

experience as a bartender, cook and hotel cleaner. Tr. 15, 92, 102, 107.

On July 1, 2002, plaintiff protectively filed applications for disability insurance and SSI benefits, alleging disability as of March 1, 1999, due to long-term drug addiction, manic depression and chronic mental illness, including memory loss and lack of ability to follow directions or keep in tune with things around her. Tr. 14-15, 76-78, 101, 358-60.  Her applications were denied initially and on reconsideration. Tr. 14, 25-27, 32, 361-62, 366-67.

A hearing was held before an administrative law judge ("ALJ") on August 17, 2004, at which plaintiff, represented by counsel, did not appear, but at which a medical expert, W. Scott Mabee, Ph.D., appeared and testified. Tr. 14, 382-93.  The hearing was continued to March 25, 2005, before the same ALJ, at which plaintiff, again represented by counsel, appeared by telephone, but did not testify. Tr. 14, 394-441.  Also at the hearing, a second medical expert, Ronald M. Klein, Ph.D., appeared and testified. Id. A third, supplemental hearing before the same ALJ was held on June 16, 2005, at which plaintiff, once more represented by counsel, appeared by telephone and testified. Tr. 14, 442-70.  A vocational expert also appeared at that hearing and testified. Id.

On September 8, 2005, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part that her "history of substance abuse/dependence" was "a contributing factor material to the determination of disability," and that:

> (1)     at step one of the disability evaluation process,[3] plaintiff had not engaged in substantial gainful activity through December 31, 2002, her date last insured, since her alleged onset date of disability; and
>
> (2)     at steps two and three, the "severity" of plaintiff's "impairment, when considering the effects of polysubstance abuse," met the requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.09, but, absent such abuse, plaintiff did "not have an impairment or a combination of impairments considered" to be "severe."

Tr. 14, 22-23.  Plaintiff's request for review was denied by the Appeals Council on March 6, 2006, making the ALJ's decision the Commissioner's final decision. Tr. 6; 20 C.F.R. § 404.981, § 416.1481.

On April 13, 2006, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#4).  Specifically, plaintiff argues that decision should be reversed and remanded for an award of

---

[3]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

benefits for the following reasons:

(a)    the ALJ erred in evaluating the medical evidence in the record;

(b)    the ALJ erred in finding plaintiff's mental impairments to be not severe in the absence of her substance abuse/dependence; and

(c)    the ALJ erred in not finding plaintiff's affective disorders, anxiety-related disorders and personality disorders met the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04, 12.06 and 12.08 respectively.

For the reasons set forth below, the Court finds the ALJ properly determined plaintiff to be not disabled, and thus affirms the ALJ's decision.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.    Plaintiff's Date Last Insured

To be entitled to disability insurance benefits, plaintiff "must establish that her disability existed on or before" the date her insured status expired. Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); see also Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1460 (9th Cir. 1995) (social security statutory scheme requires disability to be continuously disabling from time of onset during insured status to time of application for benefits, if individual applies for benefits for current disability after expiration of insured status). Plaintiff's date last insured was December 31, 2002. Tr. 14. Therefore, to be entitled to disability insurance benefits, plaintiff must establish she was disabled prior to or as of that date. Tidwell, 161 F.3d at 601. As explained below, plaintiff has not done so, nor, for the same reasons, has she shown that she is entitled to SSI benefits either before or after that date.

II.     Standards for Evaluating Drug and Alcohol Abuse

A claimant may not be found disabled if alcoholism or drug addiction would be "a contributing factor material to the Commissioner's determination" that the claimant is disabled. Bustamante v. Massanari, 262 F.3d 949, 954 (9th Cir. 2001) (citing 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)).  Similarly, the Social Security Regulations also require that the Commissioner determine whether "drug addiction or alcoholism is a contributing factor material to the determination of disability." Id. (citing 20 C.F.R. § 404.1535(a), § 416.935(a)).

To determine whether a claimant's alcoholism or drug addiction is a materially contributing factor, the ALJ first must conduct the five-step disability evaluation process "without separating out the impact of alcoholism or drug addiction." Id. at 955.  If the ALJ finds the claimant is not disabled, "then the claimant is not entitled to benefits." Id.  If the claimant is found disabled "and there is 'medical evidence of [his or her] drug addiction or alcoholism,'" the ALJ proceeds "to determine if the claimant 'would still [be found] disabled if [he or she] stopped using alcohol or drugs.'" Id. (citing 20 C.F.R. [§ 404.1535][,] § 416.935]). Thus, if a claimant's current limitations "would remain once he [or she] stopped using drugs and alcohol," and those limitations are disabling, "then drug addiction or alcoholism is not material to the disability, and the claimant will be deemed disabled." Ball v. Massanari, 254 F.3d 817, 821 (9th Cir. 2001).

III.    The ALJ's Step Two and Step Three Findings

At step two of the five-step disability evaluation process, the ALJ must determine if an impairment is "severe." Id.  An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), ( c), § 416.920(a)(4)(iii), ( c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1.  Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b), § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.  An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work."  See SSR 85-28, 1985 WL 56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff has the burden of proving that her "impairments or their symptoms affect her ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).  This step two inquiry, however, is a de minimis screening device used to dispose of

1  groundless claims.  Smolen, 80 F.3d at 1290.

2      At step three of the evaluation process, the ALJ must evaluate the claimant's impairments to see if

3  they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the

4  "Listings").  20 C.F.R § 404.1520(d), § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

5  If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled.  Id.

6  The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the

7  Listings.  Tacket, 180 F.3d at 1098.

8      A mental or physical impairment "must result from anatomical, physiological, or psychological

9  abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20

10  C.F.R. § 404.1508, § 416.908.  The impairment must be established by medical evidence "consisting of

11  signs, symptoms, and laboratory findings."  Id.  An impairment meets a listed impairment "only when it

12  manifests the specific findings described in the set of medical criteria for that listed impairment."  SSR 83-19,

13  1983 WL 31248 *2.  An impairment equals a listed impairment "only if the medical findings (defined as a

14  set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical

15  findings for the listed impairment."  Id. at *2.  However, "symptoms alone" will not justify a finding of

16  equivalence.  Id.

17      In his decision, the ALJ found the evidence in the record showed plaintiff had an impairment that

18  met the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.09, due to the effects of her substance

19  abuse.  Tr. 20, 23.  Thus, the ALJ also found her substance abuse to be a contributing factor material to the

20  determination of disability.  Id.  The ALJ further found as follows:

21        In this case, it is found that the claimant has an adjustment disorder with depressed
          mood.  Although other diagnoses have been made including major depression,
22        personality disorder, and anxiety disorder, the undersigned notes that the claimant has
          continuously used drugs and alcohol throughout the record, and has not always
23        consistently reported her use to examining practitioners.  Indeed, the record shows the
          only consistent time she was not using substances was when she was involved in
24        inpatient chemical dependency treatment.  The record shows that she has average
          intellectual functioning and memory functioning is within normal limits.
25
26  Tr. 20-21.  Accordingly, the ALJ concluded that absent her substance abuse, plaintiff did not have a mental

27  impairment that was "shown to have posed more than a minimal limitation on her ability to perform basic

28  work-related activities, and thus did "not constitute a 'severe' impairment."  Tr. 22-23.

      Here, the challenges plaintiff makes to the ALJ's adverse findings at step two and step three of the

disability evaluation process rely primarily on her argument that the ALJ erred in evaluating the medical source opinion evidence in the record.  However, because, as discussed below, the ALJ properly evaluated such evidence, he also properly determined plaintiff to be not disabled at these steps, absent the presence and effects of her substance abuse.

IV.    The ALJ Properly Evaluated the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who

do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

      A.   Dr. Mabee

Plaintiff argues the ALJ's evaluation of the medical evidence in the record was erroneous, and does not support his step two and step three findings.  In challenging the ALJ's evaluation, plaintiff first argues the ALJ erred in relying on the August 17, 2004 hearing testimony of W. Scott Mabee, Ph.D.  Dr. Mabee testified that the record was "sufficient to support" one diagnosis, that of "substance addiction." Tr. 386. He testified that there was not much evidence for a diagnosis of depression, and that plaintiff's "affective condition" could be "a function of substance addiction as opposed to a freestanding condition." Tr. 387. Thus, Dr. Mabee testified that "from the record" there did "not appear to be an independent diagnosis of depression," even if plaintiff did not have a drug addiction problem. Tr. 388-89.

Plaintiff disagrees with this testimony, pointing out that at the time of his testimony Dr. Mabee did not have before him records of visits she made to a medical health center during the two-year period of mid-November 2000 to late November 2002. See Tr. 194-205.  However, plaintiff does not explain how those records would have changed the testimony of Dr. Mabee or otherwise discredited it.  Indeed, those records tend to support that testimony.  For example, while plaintiff was diagnosed with major depression in mid-November 2000, her mental status examination was largely unremarkable. Tr. 195.  Although she again was diagnosed with depression in early November 2001, she was assessed with "[d]rug addiction in recovery." Tr. 198-200.

Indeed, just three weeks after being discharged from an inpatient chemical treatment program "after 45 days for crack cocaine abuse," plaintiff tested "positive for amphetamine, cocain and THC," and was diagnosed with "[m]ultiple chemical dependency with recent ingestion of" those substances, even though she reported having been "clean and sober" since her discharge and denied any "recent drug use." Tr. 132,

ORDER
Page - 7

198. Nevertheless, in late November 2001, plaintiff reported "doing great." Tr. 198. While plaintiff again was diagnosed with depression in early December 2001, once more she reported that she was "doing well." Tr. 201.

Plaintiff was noted to be "in some emotional distress" and was diagnosed as having anxiety in early January 2002. Tr. 202. However, she "absolutely denied suicidal ideation" and "spoke logically and coherently" during her examination. Id. Thus, even though the above records present some evidence of an affective disorder, no significant work-related limitations stemming therefrom were reported or found. In addition, given that plaintiff also underwent a month and a half of inpatient treatment for crack cocaine abuse during this period, and clearly relapsed just three weeks following her discharge from treatment, any change in Dr. Mabee's testimony appears even less likely.

Plaintiff next argues Dr. Mabee's testimony should be discounted in light of his recommendation that a consultative psychiatric evaluation be performed. It is true Dr. Mabee testified that formal testing of plaintiff's cognitive, memory and other mental functional capabilities "would provide a more complete assessment" of her condition. Tr. 389-90. However, Dr. Mabee recommended that such an evaluation be performed only if there was "greater concern and support for either a depressive or anxiety disorder." Tr. 390. Clearly from his testimony, however, Dr. Mabee did not appear to have such concern. In any event, as discussed below, formal testing of plaintiff's mental functional capabilities was later performed, but that testing showed those capabilities to be largely intact.

Plaintiff further points out that Dr. Mabee "is not a Board Certified Psychologist." While this may be true (see Tr. 45), it is not clear what being "board certified" implies in this context in terms of a medical expert's credibility. Indeed, the assumption that psychiatric or psychological evidence must be offered only by those who have been board certified "is clearly erroneous," as "[t]here is no such requirement in the [Social Security] regulations." Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987). As such, the Court finds this argument to be completely without merit.

B.    Dr. Bailey

As with Dr. Mabee's testimony, plaintiff argues the mid-October 2002 psychiatric review technique form completed by James E. Bailey, Ph.D., a non-examining consultative pscyhologist, also should not have been relied on by the ALJ. This is because, she asserts, at the time Dr. Bailey completed that report, he did

not possess the entire record. While certainly Dr. Bailey would not have access to medical evidence obtained after he provided his report, there is no indication that he did not have access to all such evidence contained in the record at the time his report was issued. At the very least, Dr. Bailey was in a position to provide a timely opinion as to plaintiff's mental functional capacity with respect to her application for disability insurance benefits as of or near her date last insured, December 31, 2002, and also with respect to her eligibility for SSI benefits up to that point in time.

Plaintiff further asserts the ALJ's reliance on both Dr. Bailey's report and Dr. Mabee's testimony is unwarranted, because they are both non-examining consultative medical sources. As noted above though, a non-examining medical source's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Lester, 81 F.3d at 830-31; Tonapetyan, 242 F.3d at 1149. Dr. Bailey found that with the effects of plaintiff's substance abuse, she would be moderately to markedly limited in her activities of daily living, social functioning, and concentration, persistence or pace. Tr. 149, 153-54. Without such abuse, however, he felt she largely would be only mildly impaired. Id. This for the most part comports with the testimony of Dr. Mabee. As discussed below, the findings and testimony of Drs. Mabee and Bailey also are largely consistent with other independent evidence in the record, medical and otherwise, regarding the nature and effects of plaintiff's substance abuse.

C.    Dr. Klein

The medical expert who appeared at the second hearing, Robert M. Klein, Ph.D., testified that while plaintiff had "some depressive component," it was neither severe nor did it meet any of the Listings. Tr. 398-99. Thus, without the influence of alcohol or drugs, Dr. Klein testified that she would have only mild mental functional limitations. Tr. 226, 399. With such influence, her limitations would be moderate, with four or more episodes of decompensation as well. Tr. 226, 399-400. As such, Dr. Klein felt plaintiff's substance abuse problem would meet the criteria of 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.09. Tr. 226-27, 400.

With respect to plaintiff's intellect and cognitive function, Dr. Klein testified as follows:

> [H]er scores in the various aspects of short-term memory range from the average range to actually the above average range, certainly nowhere near any sort of impairment and would indicate that despite the drug abuse and alcohol problems that this woman has had over the years her intellect and cognitive function is well preserved.

Tr. 401. Dr. Klein further testified that plaintiff's full-scale IQ score itself, while in the low average range,

1   was "certainly consistent with performing substantive gainful activity," which he noted the record indicated

2   she had done "for the majority of her adult life." Tr. 403.  On the other hand, Dr. Klein also testified that

3   her psychological testing results were "highly suspicious for deliberate display of negative psychological

4   factors," which he noted made her "appear more impaired" and would be "highly unusual even for chronic

5   psychiatric patients who have been hospitalized several times." Tr. 401-02.

6          Indeed, Dr. Klein testified that plaintiff's results "were so pronounced as to essentially identify" her

7   "profile as an attempt to fake psychopathology," presumably "for the purpose of obtaining secondary gain

8   in the form of disability payments." Tr. 402, 413.  Because of this, as well as due to her vocational activity

9   history, her lack of psychiatric inpatient history and her substance abuse treatment history, Dr. Klein found

10  plaintiff's self reports to be not credible, and he thus gave them "[n]ot very much" weight. Tr. 409-10, 414.

11  Accordingly, with respect to the non-cognitive, emotional factors of her psychological testing, he felt she

12  came "pretty clearly across as a malingerer." Tr. 411-12.

13         In regard to plaintiff's substance abuse, Dr. Klein testified that the record showed it had "been a

14  significant and chronic problem over the course of time," and that it was "the primary factor" affecting her.

15  Tr. 403-04.  As such, he felt one "certainly would expect her overall emotional function to improve" when

16  she was away from such substances. Tr. 403.  Nevertheless, as he previously testified, Dr. Klein again noted

17  that despite such long-standing abuse, plaintiff had "really quite good preservation of cognitive function,"

18  and no "organic brain damage" was evident. Tr. 404-05.  Thus, other than substance abuse, Dr. Klein found

19  the only other proper diagnosis consisted of a mild adjustment disorder with depressed mood, which he felt

20  was not severe. Tr. 399, 405-06.  Further, he saw "no convincing behavioral data" warranting a diagnosis of

21  panic disorder with agoraphobia. Tr. 406.

22         As with Dr. Mabee, plaintiff implies that because Dr. Klein is not a board certified psychologist, his

23  testimony should be discounted.  As discussed above, however, this is not a valid reason for discounting

24  such evidence. See Sprague, 812 F.2d at 1232.  Plaintiff also argues Dr. Klein's testimony should not be

25  credited, because his diagnoses were not consistent with any of the examining medical opinion sources in

26  the record.  While it may be true that Dr. Klein's diagnoses differ from those of such other sources, this

27  difference alone is not a legitimate reason to discredit his testimony regarding plaintiff's mental functional

28  capabilities.  This is because it is a claimant's actual work-related limitations, rather than the diagnoses

1   themselves, that ultimately determine disability. <u>See</u> <u>Moncada v. Chater</u>, 60 F.3d 521, 523 (9th Cir. 1995)

2   (mere diagnosis of impairment does not establish disability).

3        In any event, the examining medical sources in the record do not themselves appear to be in full

4   agreement regarding plaintiff's diagnoses.  For example, Russell M. Bragg, Ph.D., diagnosed plaintiff with a

5   bipolar disorder, while Thomas Rowe, Ph.D., ruled out that diagnosis. Tr. 210, 235-36.  In addition, Dr.

6   Rowe diagnosed plaintiff with a personality disorder, which Dr. Bragg did not do. <u>Id.</u>  Plaintiff does not

7   argue that the opinions of either of these medical sources be discounted because of these differences, nor

8   should they for that reason.  For the same reason, neither should Dr. Klein's testimony.

9        Plaintiff next asserts that Dr. Klein was disingenuous on the issue of malingering, stating that he was

10  not diagnosing her as such, but then making repeated references to it and further testifying that he found her

11  self reports lacked credibility.  There is nothing disingenuous, however, regarding the testimony Dr. Klein

12  provided on this issue.  As discussed above, Dr. Klein clearly and consistently testified that he did not think

13  plaintiff was malingering with respect to her cognitive factors, but that she was malingering in regard to her

14  emotional factors.  Further, he gave specific reasons as to why he felt plaintiff was not fully credible, which,

15  he testified, consisted of her long work history, her lack of mental health treatment over time, her substance

16  abuse history, and her likely "deliberate display of negative psychological factors," which he noted would

17  have been "highly unusual even for chronic psychiatric patients who have been hospitalized several times."

18  Tr. 401-02.

19       Plaintiff also argues that Dr. Klein was "combative and uncooperative" during the hearing, and that

20  this behavior was "consistent with the bias he showed in his testimony against" her. Plaintiff's Motion for

21  Summary Judgment, p. 10.  A careful review of that hearing testimony, however, fails to support plaintiff's

22  argument on this issue.  While it is clear that both plaintiff's counsel and Dr. Klein may have had at least

23  some frustration with each other regarding the form of questioning and the responses provided, there is no

24  indication that Dr. Klein exhibited any actual bias toward plaintiff.  Certainly, plaintiff may be dissatisfied

25  with the answers provided by Dr. Klein.  This fact alone though is not enough to show bias.  In addition,

26  merely because the medical expert may find a claimant lacks credibility and, in that expert's opinion, the

27  record does not support a finding of disability, is not in itself evidence of prejudice.

28

ORDER
Page - 11

1          D.       Dr. Rowe, Dr. Harris and Dr. Bragg

2          Finally, plaintiff argues Dr. Mabee's and Dr. Klein's testimony and Dr. Bragg's report should not

3   carry any weight in light of the findings of Dr. Rowe, Dr. Bragg and Lance Harris, Ph.D. The Court does

4   not agree.  First, the findings and opinions of Dr. Rowe are not necessarily entirely inconsistent with the

5   findings and testimony of Drs. Mabee, Bailey and Klein.  This is particularly true with respect to the effects

6   plaintiff's substance abuse has had on her mental functional capabilities.  For example, during an early

7   December 2004 evaluation, in regard to her substance abuse history, plaintiff told Dr. Rowe that "by the

8   time she was 14 she was using cocaine regularly," and that this had "continued to the present." Tr. 207.

9   Indeed, she reported that "during the first six months" of 2004, she "used a lot," though she claimed she

10  was "now using far less often," the last time being "about a month ago." Id.

11         Plaintiff further reported that "she remained clean and sober for about one year" following the "45-

12  day inpatient" chemical dependency treatment program she completed in 2001. Tr. 208.  However, as

13  discussed above, plaintiff tested positive for multiple chemical substances just three weeks after she was

14  discharged from that program.  In addition, she told Dr. Rowe she again completed a "21-day program" at

15  an alcohol treatment center in 2002, after which she stated she "then immediately relapsed." Id.  Plaintiff

16  told Dr Rowe as well that she underwent a third, 28-day treatment program earlier in 2004. Id.  Dr. Rowe

17  noted that while plaintiff claimed to have "now been clean and sober for 3 months," she also stated "she last

18  used cocaine about a month ago." Id.

19         During the evaluation, plaintiff's attention and concentration were noted to be good, and she "had

20  no difficulty following a logical stream of conversation." Tr. 209.  Dr. Rowe noticed "no indications of

21  anxiety" during the interview or testing. Id.  Plaintiff's "thought processes were clear with no evidence of a

22  thought disorder." Id.  She also "had no difficulty comprehending" the psychological test instructions, and

23  "was able to complete all the protocols within an average period of time." Id.  Although the testing itself

24  revealed some suggestion of "cognitive impairment," there was "no indication . . . to suggest any memory

25  impairment." Id.  Finally, Dr. Rowe noted that while plaintiff "was probably not malingering," there were

26  indications of "a deliberate attempt to emphasize pathology." Tr. 210.

27         Dr. Rowe diagnosed plaintiff with "[c]ocaine abuse, in early partial remission, by patient report,"

28  "[p]olysubstance dependence, in sustained remission, by patient report," major depression, panic disorder

ORDER
Page - 12

with agoraphobia, and a personality disorder. Id.  He also gave her a global assessment of functioning

("GAF") score of 45, both current and her highest during the past year. Id.  Dr. Rowe concluded his report

by stating in relevant part as follows:

> The diagnoses of cocaine abuse and polysubstance dependence are based on her reports
> of a lifetime of alcohol and polysubstance abuse and her reports that she recently
> completed chemical dependency treatment and is now in at least partial recovery.  She
> made the statement that she still has an occasional drink and she also said she used
> cocaine about a month ago, though based on the history she related this is a substantial
> reduction in her abuse of alcohol and illicit drugs. . . . [W]hile she related a history of
> severe agoraphobia and panic, I have to say that she was quite relaxed during the
> interview with no symptoms of anxiety noted. . . . There is certainly the possibility that
> Cheri also has a bipolar disorder, though her psychological and social histories are so
> rampant with alcohol and substance abuse that it is difficult to determine if there may be
> an underlying bipolar disorder.  In any event, if she were able to maintain her sobriety
> for an extended period of time, I would recommend that she make contact with the local
> mental health center and be followed for at least ongoing treatment of her depression
> and for monitoring of any possible further bipolar symptoms. . . . While Cheri had
> complaints of memory impairment, there is no objective indication of this from the test
> results and I suspect her perceptions of memory impairment can be attributed to her
> depression.

Tr. 211.

In response to a set of interrogatories that later were submitted to him, Dr. Rowe stated plaintiff's

"reported daily activities" were "consistent with a major depression." Tr. 340.  He further stated that while

no anxiety or agoraphobic symptoms were noted during his evaluation of her, this was "not particularly

unusual in the course of a clinical interview that is conducted in a secure and supportive environment." Id.

In addition, Dr. Rowe stated that although plaintiff's "extremely exaggerated" psychological testing profile

"certainly could be a result of deliberate malingering," he did not think this was the case. Id.  He also stated

he "saw no evidence to suggest" plaintiff "was under the influence of alcohol or drugs or in a withdrawal

state from drugs and alcohol" during the evaluation. Tr. 341.

With respect to the GAF scores he gave plaintiff, Dr. Rowe stated that they were "based solely on

her psychiatric illnesses," and that the fact that they remained the same over the course of the same year

indicated "her condition had generally remained static." Id.  On the other hand, he admitted that "[t]he GAF

score is a global assessment of functioning and does not rely solely on objective findings but also includes

the patient's behavior during the clinical interview and their [sic] reported level of adaptive functioning." Tr.

342.  Thus, Dr. Rowe noted that "[w]hile the objective findings do not indicate any particular memory or

cognitive impairment, her reported level of functioning certainly indicates serious symptoms in the GAF

range reported." Id.

It further was Dr. Rowe's opinion that plaintiff's "reported symptoms and description of her daily functioning" indicated "a serious impairment," and that her "inactivity and lack of routine" were "symptoms related to her major depression." Tr. 341-42.  However, Dr. Rowe also stated that because she was "in the early stages of recovery from her alcohol and chemical dependency," her "social isolation" might "further reflect an attempt on her part to shelter herself from temptations to relapse," adding that:

> Throughout her life, Ms. Brudevold has demonstrated only marginal functioning and her social isolation now appears to represent an attempt on her part to minimize her risk of further relapse.  I further believe that her lack of confidence in her ability to function as a clean and sober individual further contributes to her agoraphobia and panic symptoms.

Tr. 341-42.  Dr. Rowe concluded that plaintiff's mental impairments met the criteria for those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.08 (personality disorders). Tr. 343.  He also completed a medical source statement of ability to do work-related activities at the same time, in which he found plaintiff had a number of moderate to marked mental functional impairments. Tr. 344-47.

In giving "little weight" to the assessment of plaintiff's mental functioning capabilities, the ALJ noted Dr. Rowe's observation that she was inconsistent in reporting her substance use and abuse. Tr. 21.  The ALJ also pointed out Dr. Rowe's notation that her psychological and social histories were "so rampant with alcohol and substance abuse" that it was difficult to make a full psychological diagnosis of her possible mental impairments. Id.  Finally, the ALJ considered the fact that "all cognitive testing had been within normal limits," despite Dr. Rowe's diagnosis of a possible learning disorder. Id.  These are all valid reasons for discounting the credibility of Dr. Rowe's opinion.

First, discrepancies between a medical opinion source's functional assessment and that source's clinical notes, recorded observations and other comments regarding a claimants capabilities "is a clear and convincing reason for not relying" on the assessment. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005); see also Weetman v. Sullivan, 877 F.2d 20, 23 (9th Cir. 1989).  Here, the ALJ noted contradictions between the clinical findings contained Dr. Rowe's evaluation of plaintiff and his opinions contained therein. The responses Dr. Rowe provided in response to plaintiff's interrogatories also contradict those findings in many ways.  The ALJ did not err in relying on the actual clinical findings themselves, rather than the contradictory statements made by Dr. Rowe, especially when those findings are not inconsistent with the

1  weight of the medical evidence in the record, including the testimony of Dr. Mabee and Dr. Klein and the

2  findings of Dr. Bailey.

3      As discussed above, Dr. Rowe, as did Drs. Mabee, Bailey and Klein, noted plaintiff's history was

4  rife with substance abuse, including the fact that she had just completed her third in-patient detoxification

5  program earlier that year.  Indeed, Dr. Rowe specifically commented that mental health treatment would be

6  appropriate, but only "if she were able to maintain her sobriety for an extended period of time." Tr. 211.

7  Dr. Rowe further made clear that his findings and diagnoses regarding the state of plaintiff's substance

8  abuse and recovery efforts were based largely on her own self-reporting.  Also as discussed above,

9  however, Dr. Rowe himself noted inconsistencies in that reporting.

10     The ALJ further found plaintiff's self-reports to both Dr. Rowe and the other medical sources in the

11  record were "not credible" (Tr. 21), a finding plaintiff does not challenge here.  A medical source's opinion

12  premised on a claimant's subjective complaints, however, may be discounted where the record supports the

13  ALJ in discounting the claimant's credibility, as it does here in light of plaintiff's concession on this issue

14  and the above-noted inconsistencies in her self-reporting. See Tonapetyan, 242 F.3d at 1149; see also

15  Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999) (medical

16  opinion premised to large extent on claimant's own accounts of her symptoms and limitations may be

17  disregarded where they have been properly discounted).  As noted above, this is one of the reasons why the

18  ALJ discounted the credibility of Dr. Rowe's opinion regarding her functional assessment.

19     Dr. Rowe's responses to the interrogatories also are not nearly as helpful to plaintiff as she makes

20  them out to be.  For example, while Dr. Rowe downplayed the absence of any anxiety or agoraphobic

21  symptoms during the evaluation, he did admit plaintiff's "extremely exaggerated" psychological testing

22  profile "certainly could be a result of deliberate malingering," though he did not actually think this to be the

23  case. Tr. 340.  Further, although Dr. Rowe did not see anything to suggest she was under the influence of

24  alcohol or drugs during the evaluation itself, he acknowledged her low GAF scores and noted limitations in

25  activities of daily living and social functioning were based in large part on her own self-reporting.[4]  Dr.

26  Rowe also pointed out that those symptoms had much to do her "early stages" of substance abuse recovery

27

28

[4]In this regard, Dr. Rowe's opinion is largely consistent with the testimony of Dr. Klein, who did not place "great amounts of meaningfulness" on the GAF scores because of "the subjective nature of them." Tr. 430, 435.

and attempts to "minimize her risk of further relapse." Tr. 341-42.

Plaintiff asserts Dr. Klein and Dr. Rowe disagreed on the "critical issues" of her credibility, the issue of malingering, the relevance of her activities of daily living and how they correlate to her mental health impairments, the importance of the GAF scores, and the question of whether the criteria of any of the Listings were met in the absence of substance abuse. Plaintiff's Motion for Summary Judgment, p. 11-12. Though certainly true in a number of ways, the resolution of conflicts in the medical evidence in the record is the sole responsibility of the ALJ. See Reddick, 157 F.3d at 722; Sample v. Schweiker, 694 F.2d at 642. As explained above, furthermore, the ALJ provided valid, legitimate reasons for discounting Dr. Rowe's opinion. Also as explained above, Dr. Klein's findings were not as inconsistent with the testimony of Dr. Klein as plaintiff makes them out to be.

Lastly, plaintiff asserts the findings and opinions of Dr. Harris and Dr. Bragg, two other examining psychologists in the record, are consistent with the findings and opinion of Dr. Rowe, and thus should have been given greater weight then those provided by Drs. Mabee, Bailey and Klein. While generally the opinion of examining medical sources are given preference over those of non-examining medical sources, in this case the ALJ was correct in declining to do so. For example, while, as explained below, Dr. Harris did find significant mental functional limitations, the ALJ properly discredited those limitations, because again they were overly based on plaintiff's inconsistent self reports regarding her substance abuse.

Dr. Harris evaluated plaintiff for the first time in late May 2002, finding her to have a number of moderate, and one marked, mental functional limitations based on diagnoses of a depressive disorder and cocaine dependency and polysubstance/opoid dependence, both in "alleged" full sustained remission. Tr. 191-92. However, Dr. Harris himself noted there were issues with plaintiff's credibility, thought her cognitive limitations could possibly be the result of substance abuse, and felt at least a further six-month period of abstinence would be needed for full remission. Id. Indeed, he opined that a "severe" on-going "crack addiction" was possibly existent. Tr. 193.

In a second evaluation report provided in early June 2004, Dr. Harris found more severe mental functional limitations based on the diagnoses of, among others, a severe major depression with psychotic features, chronic posttraumatic stress disorder, and a panic disorder, along with possible alcohol and drug dependence in partial and full sustained remission respectively. Tr. 238-39. Again, however, Dr. Harris

1   indicated there was at least the question of whether these diagnoses were due to the presence of substance

2   abuse. Tr. 238.  This is especially notable, considering plaintiff had completed her third inpatient chemical

3   dependency treatment program a mere two and a half weeks earlier. Tr. 261, 263.  As with his rejection of

4   Dr. Rowe's mental functional capacity assessment, therefore, due to the inconsistency of plaintiff's self

5   reporting, her lack of credibility, and evidence of continued substance abuse in the record, the ALJ properly

6   rejected those of Dr. Harris' diagnoses which indicated her mental functional limitations were unrelated to

7   the effects of her substance abuse. <u>See</u> Tr. 21.

8           With respect to Dr. Bragg, he evaluated plaintiff in early October 2003.  He found the pattern of her

9   reported symptoms to be consistent with a diagnosis of panic disorder with agoraphobia. Tr. 231.  He also

10  diagnosed her with a severe bipolar I disorder, without psychotic features, and polysubstance and cocaine

11  dependence in full and early full sustained remission respectively. Tr. 235-36.  In addition, Dr. Bragg gave

12  her a GAF score of 45, both current and the highest in the past year. Tr. 236.  Based on these diagnoses,

13  Dr. Bragg found that plaintiff had a number of moderate to marked mental functional limitations, that she

14  did "not appear capable of working at the present time due to the severity of her affective disorder, in spite

15  of the use of multiple medications," and that she would "likely remain unemployable for the next 6-12

16  months," while she participated in treatment. Tr. 234, 236.

17          At the time of the evaluation, however, Dr. Bragg noted plaintiff's chief complaint was that she

18  wanted "her goddamed medical coupons." Tr. 232.  This statement, which the ALJ noted in his decision,

19  comports with Dr. Klein's testimony that plaintiff appeared to be motivated by secondary gain. <u>See</u> Tr. 21.

20  The ALJ also noted that while plaintiff told Dr. Bragg she was having significant problems with mental

21  functioning, she reported to other mental health professionals at the time that things were "not going too

22  bad for her mentally." Tr. 21, 246.  Indeed, just eight days prior to Dr. Bragg's evaluation of her, it was

23  noted that medications appeared "to be holding her quite well." Tr. 247.

24          The ALJ, furthermore, noted that although plaintiff informed Dr. Bragg that she had not used any

25  cocaine "in almost two months," she apparently continued to use drugs as evidenced by her admission to

26  her third inpatient chemical dependency treatment program just six months later in April 2004. Tr. 21, 232,

27  263-64, 266.  Given that Dr. Bragg found plaintiff's polysubstance and cocaine dependency to be in full

28  remission, presumably based on her own self reports, and that the ALJ properly found plaintiff's self

1   reporting to not be credible, as evidenced by the statements she made to Dr. Bragg and the other medical

2   sources in the record noted above, and once again by her most recent noted relapse, the ALJ was not remiss

3   in not adopting Dr. Bragg's findings.

4       Accordingly, because, for the reasons set forth above, the ALJ did not err in evaluating the findings

5   and opinions of Dr. Rowe, Dr. Harris, and Dr. Bragg, as well as those of the other medical evidence in the

6   record, his determination that plaintiff had no severe mental impairment absent the effects of her substance

7   abuse was proper as well.

8                                          CONCLUSION

9       Based on the foregoing discussion, the Court finds the ALJ properly determined plaintiff was not

10  disabled.  Accordingly, the ALJ's decision hereby is AFFIRMED.

11      DATED this 12th day of December, 2006.

12

13

14                                    Karen L. Strombom
                                      United States Magistrate Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28